**BOARD OF INS. COM'RS et al. v. CARTER.**

**No. 9858.**

Court of Civil Appeals of Texas. Austin.

March 1, 1950.

Rehearing Denied March 22, 1950.

Price Daniel, Attorney General, Ned Mc-Daniel and Clinton Foshee, Assistant Attorneys General, for Board of Insurance Commissioners. Thompson, Knight, Wright, Weisberg & Simmons, William H. Neary, Will C. Thompson, of Dallas, for intervenors, Nat. Fire Ins. Co. of Hartford and others.

Jones & Herring, by Herman Jones, of Austin, for appellee.

HUGHES, Justice.

Jess D. Carter sued the Board of Insurance Commissioners of Texas and its members to compel cancellation of an order adopted by the Board prohibiting any insurance company from insuring the first $100 of loss resulting from windstorm, hurricane or hail.

The only interest which Mr. Carter has in this order is, reflected by his testimony, that he is unable to buy insurance against these hazards covering the first $100 of loss. This is true, yet it is an interest which is common to all. Mr. Carter predicates his right to maintain this suit upon Art. 4893, Vernon's Ann.Civ.St., and his right to do so has not been challenged. We, therefore, assume his authority.

Many insurance companies have intervened and are aligned with the Board.

After a non-jury trial the court "making no determination with reference to whether or not the order herein attacked is unreasonable, arbitrary or discriminatory, is of the opinion that said order of June 13, 1949, and the orders and rules continued in effect thereby were adopted by the Defendant Board without statutory authority," and accordingly rendered judgment vacating and annulling the order in question.

The statutes relied on by the Board to show its statutory authority are:

Article 4905A, Acts 1945, p. 214, which provides that the writing of insurance against loss by tornado, windstorm, hail, etc., "shall be governed and controlled by the provisions of Articles 4878 to 4901, inclusive, and also Articles 4903 to 4905, inclusive, of Chapter 10, Title 78, Revised Civil Statutes of 1925, including amendments to Article 4891, in the same manner and to the extent as fire insurance and fire insurance rates are now affected by the provisions of said Articles of said Chapter."

Article 4878. "The State Insurance Commission shall have the sole and exclusive power and authority and it shall be its duty to prescribe, fix, determine and promulgate the rates of premiums to be charged and collected * * *. Said Commission shall also have authority to alter or amend any and all such rates of premiums so fixed and determined and adopted by it, and to raise or lower the same, or any part thereof, as herein provided. * * * Said Commission shall ascertain as soon as practicable the annual fire loss in this State; obtain, make and maintain a record thereof and collect such data with respect thereto as will enable said Commission to classify the fire losses of this State, the causes thereof, and the amount of premiums collected therefor for each class of risks and the amount paid thereon, in such manner as will aid in determining equitable insurance rates, methods of reducing such fire losses and reducing the insurance rates of the State, or sub-divisions of the State."

Article 4879 provides that maximum premium rates shall be established by the Board with companies privileged to write insurance for less than this rate so long as they are uniform in the same community.

Article 4881 authorizes the Board to obtain certain information in order "to enable said Commission to make, amend and maintain the general basis schedules provided for in this law and the rules and regulations for applying same and to deter-

mine reasonable and proper maximum specific rates and to determine and assist in the enforcement of the provisions of this law."

Article 4882 provides, in part: "The rates of premium fixed by said Commission in pursuance of the provision of this law shall be at all times reasonable and the schedules thereof made and promulgated by said Commission shall be in such form as will in the judgment of the Commission, most clearly and in detail disclose the rate so fixed and determined by said Commission to be charged and collected for policies of fire insurance."

The same Article authorizes the use by the Board of any data "which in their opinion will enable them to devise and fix and determine reasonable rates of premium for fire insurance. The said Commission in making and publishing schedules of the rates fixed and determined by it shall show all charges, credits, terms, privileges and conditions which in any wise affect such rates * * *."

Articles 4888 and 4889 provide for uniform policies and standard forms, respectively, and they read:

"The Commission shall make, promulgate and establish uniform policies of insurance applicable to the various risks of this State, copies of which uniform policies shall be furnished each company now or hereafter doing business in this State. After such uniform policies shall have been established and promulgated and furnished the respective companies doing business in this State, such companies shall, within sixty days after the receipt of such forms of policies, adopt and use said form or forms and no other; also all companies which may commence business in this State after the adoption and promulgation of such forms of policies shall adopt and use the same and no other forms of policies." Article 4888.

"The Commission shall prescribe all standard forms, clauses and endorsements used on or in connection with insurance policies. All other forms, clauses and endorsements placed upon insurance policies shall be placed thereon subject to the approval of the Commission. The Commission shall have authority in its discretion to change, alter or amend such form or forms of policy or policies, and such clauses and endorsements used in connection therewith, upon giving notice." Article 4889.

The position of the Board is that the above statutes, particularly Articles 4888 and 4889, together with authorities later to be noticed, authorized promulgation of the mandatory order of which complaint is made. Appellee Carter cites the following cases as decisive in his behalf: Commercial Standard Insurance Co. v. Board of Insurance Commissioners, Tex.Civ.App., Austin, 34 S.W.2d 343, Writ Ref.; Scanlan v. Home Ins. Co., Tex.Civ.App., Beaumont, 79 S.W.2d 186, Writ Ref.; and Board of Insurance Commissioners v. Guardian Life Insurance Co., 142 Tex. 630, 180 S.W.2d 906.

We will discuss these cases in the order named.

The single question before the court in the Commercial Standard case was the validity of an order of the Board of Insurance Commissioners fixing the amount of commissions an insurance company could pay its local agents. The order was invalidated principally upon the ground that the order, if upheld, would permit the Board to usurp the right of private management of insurance companies which the statutes did not authorize.

In the Scanlan case the court held that the Insurance Board could not effectively incorporate a provision in a policy which was repugnant to a statute.

In the Guardian Life case the court held that where the statute expressly provided how reserve requirements of life insurance companies should be computed, the Board had no authority to compute them otherwise.

If we examine the statutes (enumerated above) which now govern and control the writing of windstorm, hail and tornado insurance, we find that a policy may not validly contain any provision violating the statute as to encumbrances, 4890, V.A.C.S., and may not validly contain any pro-

vision violating the statute as to co-insurance, 4891, V.A.C.S., but we find no statute requiring the *inclusion* of *any* provision in such an insurance policy. The uniform policy and the standard forms which the legislature directed the Board to prescribe and promulgate would be blanks, if specific statutory authority is essential. That it is not essential we need only refer to McPherson v. Camden Fire Ins. Co., Tex.Com.App., 222 S.W. 211, 214, which upheld the "iron-safe clause" prescribed by the Insurance Commission without specific statutory authority, and Commercial Union Assurance Company v. Preston, 115 Tex. 351, 282 S.W. 563, 45 A.L.R. 1016, which upheld a clause prescribed without specific statutory authority limiting liability to three-fourths of the value of personal property.

Under the foregoing authorities there is no room for an extreme rule that the Board can write any kind of policy it sees fit as long as no positive statute is violated, nor is there room for a rule to the opposite extreme that the Board may not require the inclusion of any clause in a policy without specific statutory authority. Between these extremes lies the true power of the Board.

The decision in the Commercial Standard case, supra, curtails the right of the Board to interfere with the internal management only of an insurance company. It could not possibly mean otherwise. Assuredly the Board has some powers and every power that it does possess is a power that the company and its right of management has lost. Other powers of the same nature as the one reserved to the company by the decision in the Commercial Standard case could very well be, size of office, amount of rent, number of employees, their salaries, office hours, and many more.

We have no difficulty in deciding that the policy provision before us has no resemblance to the provision or character of provision invalidated in the Commercial Standard case. It is, in our opinion, of the same classification as the "iron-safe clause" and the "three-fourths" value clause. It does not purport to regulate the private,

inner affairs of the insurance company. It pertains to the insurance coverage which a company may sell and the public may buy. It tends to stabilize this branch of the insurance business and this is a matter of general concern in which the public interest is involved. Statutory authority for the Board to adopt the "iron-safe clause" and the "three-fourths value" clause having been sustained by the courts compels us to hold that ample authority is present here.

Appellee suggests that this construction of Articles 4888 and 4889 would render them unconsitutional as an improper delegation of legislative power, and cites as his authority 29 Am.Jur., p. 62, par. 25, and 16 C.J.S., Consitutional Law, § 138 (11).

Appellants and intervenors have filed exhaustive briefs on this question, in which are discussed most of the cases cited by the two legal publications named above. None of the cases is from Texas.

We are entirely satisfied that these statutes do not consitute an improper delegation of legislative authority, but, for reasons now to be stated, we do not feel it our duty to discuss the question at great length.

These statutes were enacted in 1913, since which time those in charge of the state insurance department have prescribed uniform policies and standard forms. Many of the provisions of such policies have been before our courts. The "iron-safe clause" and the "three-fourths value" clause having been held valid by the Supreme Court. The present question of constitutionality was not discussed in those cases, but the Supreme Court must have been aware of the following statements of this court in North River Ins. Co. v. Thomas, Tex.Civ.App., 264 S.W. 589, 591, affirmed Thomas v. North River Ins. Co., Tex.Com.App., 277 S.W. 1041:

"Whenever the question has arisen, so far as we have been able to find, it has been uniformly held that the power to prescribe a uniform policy and to render all provisions of policies not in conformity therewith nugatory is a legislative func-

tion, which cannot be delegated to any other board or official.

\* \* \* \* \* \*

"In Commercial Union Assurance Co. v. Preston, Tex.Civ.App., 238 S.W. 326, the same effect was given to the uniform policy adopted by the fire insurance commission as has been given in other states to uniform policies adopted by legislative act. That case is now under submission in the Supreme Court. The constitutionality of the insurance commission law on the ground that the Legislature could not delegate to the commission the power to prescribe a uniform policy does not seem to have been raised in the case."

Motion for rehearing in the Court of Civil Appeals in the Thomas case was overruled July 5, 1924, and the opinion of the Commission was dated December 10, 1925. Motion for rehearing in the Court of Civil Appeals in the Preston case was overruled March 11, 1922, and the opinion of the Supreme Court was on March 31, 1926. So, from about the 5th of August, 1924, to December 10, 1925, the Supreme Court had before it both the Thomas and Preston cases. Under these circumstances we do not feel authorized in considering the constitutionality of these statutes an open question.

Appellee's remaining points are to the effect that the $100 Deductible Clause abridges freedom of contract and denies equal rights and protection of the law, in violation of the State and Federal Constitution. Vernon's Ann.St.Const. art. 1, § 19; Const.U.S. Amend. 14.

No authorities, other than the Constitutions, are cited in support of these points.

Of course, freedom of contract is abridged by this clause as is the freedom to contract abridged by virtually every order which regulates any business. Appellee concedes that the insurance business is affected with a public interest and subject to regulation by the State. Along with this concession necessarily goes the lawful right to interfere with freedon of contract.

The other constitutional questions relate to the reasonableness of the order, and intelligent answers require a brief summary of the situation which prompted its adoption.

Several years prior to 1946, when the $100 Deductible Clause was first ordered, the loss ratios on storm coverage showed an alarming increase. Mr. Paul Brown, State Fire Insurance Commissioner, testified that the estimated permissible maximum of losses was 55%, calculated on the basis of the ratio of the amount of insurance written to the amount of losses paid. In 1940 this loss ratio was 53%, in 1941—81%, 1942—109%, 1943—142%, 1944—57%, 1945—50%, and was continuing in 1946 at 70%.

It was shown that insurance companies had lost $23,000,000 on windstorm insurance in Texas in about nine years just prior to the order of September 1946.

Mr. Marvin Hall, former Fire Insurance Commissioner, testified that the result of these losses was that insurance companies were having difficulty in buying reinsurance and hence were forced to withdraw from this field of insurance in Texas.

Mr. Gus Wortham, an insurance executive of Texas with 37 years of experience, gave this resume of the situation:

"The experience on windstorm and insurance started to produce a very high loss ratio beginning about 1940 or in 1940. We had a series of hurricanes that hit the Gulf Coast, and we also had unprecedented up to that time hail storm losses in San Antonio, Dallas, Coleman, and any number, just a large number of smaller towns throughout the State. As a result of that increased loss ratio, the rates on dwellings inland, increased, starting from 27 cents to 30, somewhere again, around 35, 37, and finally up to 42 cents per $100. I am speaking of dwellings, which is a very predominant premium producer in that line of business. The other rates increased proportionately. The dwelling rates on seacoast increased from 35 cents per hundred to 60 cents per hundred. Those rates were at the urgent insistence of the companies. We insisted and urged those rates long before they were granted, and we felt that we were entitled to them, one of the reasons being that the volume

of this business had grown from a mere 2 or 3 million dollars until it has now reached the almost unprecedented figure of about 33 million dollars, and we were faced with this situation in written premiums and paid losses, and we were urging the consideration of this insurance or the rates on this basis, which was the basis upon which we have always been required to file our annual statements with the department and on which our statements are based, and that is the law, and not by our own act. We urged the adoption of the $50 deductible, that was granted, I would say, about in 1944 on the seacoast only. A rate was promulgated for the $50 deductible of 12 per cent, or $12 which is at the rate of 12 per cent—24 per cent per 100. We were very hopeful about that, and that was in lieu of a rate increase. We asked for that instead of a rate increase, because we didn't feel a rate increase would solve the problem. I think we would have gotten better results, but in the great majority of cases, or particularly on the very large number of new risks that were being built, the new dwellings that were being built were mortgaged dwellings that were financed through the FHA and GI's and people of that kind, and the mortgagees required that they pay the additional $12 to take off the $50 deductible, so we got very little benefit from that, and even that high rate proved inadequate as far as our company was concerned, because we kept a record of such losses on policies carrying the $50 deductible, as we had during the period that it was in effect. With the $50 deductible, losses continued to mount. We had a hail storm, we had the tornadoes and we had the hurricanes.

\* \* \* \* \* \*

"\* \* \* We were faced with the situation as far as our company was concerned, of either discontinuing business or of a deductible form. Even a substantial increase in rate, which would have meant a rate in the inland territory of about 75 cents rather than 43 cents, and in the seacoast area of approximately $1.25, we couldn't survive under a rate of that kind, nor could a great many other companies because of the concentration of

risks that you have in areas like the Houston, Galveston, Beaumont, Port Arthur area, the Corpus Christi area, and your area in the valley \* \* \*.

\* \* \* \* \* \*

"I can speak from personal experience. We would have been unable to renew our catastrophe coverage, which we carry in Lloyd's, our only market. Without a $100 deductible, we would have to reduce our volume of business in Houston and the Houston area by at least 75 per cent, because we had some 6,000 risks that we had —at that time."

Mr. R. B. Cousins, Jr., former Insurance Commissioner, testified: "\* \* \* My information, however, and my contact with the business is that there was grave danger of the loss of the entire reinsurance market, that is the reinsurance market which is known as the catastrophe reinsurance market, without which no company can safely engage in the business of writing windstorm insurance in Texas, and there was grave danger of the loss of that market in the absence of some very drastic action on the part of the Board."

█ This evidence is, in our opinion, sufficient to show that the order is not so unreasonable as to be invalid. It may not be perfect. It may not be the best solution to the problem which could be devised. Experience alone will demonstrate its strength or weakness.

Appellee is deprived of the right to insure his property against storm damage to the extent of the first $100 of his loss. This may be regrettable, but if to give him this privilege would so increase the cost of storm insurance as to be prohibitive, he and those like him must endure for the public good. We do not believe, however, that he will suffer to the extent he imagines.

What we are dealing with here is insurance—not with contracts for the repair of one's roof.

The theory of insurance is that many people pay small amounts for protection against calamity or disaster which will befall the few. The loss of $100 is not insignificant, but neither is it a calamity

or disaster as those words are commonly understood.

To "insure" against trivial losses is to pay exorbitant sums to others for service which could be rendered by the individual with more satisfaction and at less cost. Health insurance is a fair example. If the insurance company had to pay, without restriction, for every ache and pain and for every pill and potion, the cost of administering such insurance would be so great as to defeat its purpose.

The trial court should have rendered judgment against appellee. It is therefore ordered that the judgment of the trial court be reversed and judgment is here rendered that appellee take nothing by his suit.

Reversed and rendered.